Frank Sidney FERGUSON, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 14–01–01159–CR, 14–01–01160–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Jan. 9, 2003.

Rehearing Overruled Jan. 23, 2003.

Stanley G. Schneider, Houston, for appellants.

Kevin P. Keating, Houston, for appellees.

Panel consists of Chief Justice BRISTER and Justices HUDSON and FOWLER.

## CORRECTED MAJORITY OPINION

SCOTT BRISTER, Chief Justice.

In October 1999, appellant Frank Sidney Ferguson assisted three current or former peace officers in stopping a motor home, in which they found what appeared to be fifty kilograms of cocaine. Shortly thereafter, appellant assisted in a raid on a "stash house" from which $50,000 in cash was recovered.

But a jury found they were acting as outlaws, not officers of the law. According to three accomplices who testified at appellant's trial, their operations were one of several "drug rip-offs" in which renegade officers would steal narcotics and money under the pretense of conducting police raids, sell the narcotics, and keep the proceeds for themselves. According to their testimony, appellant participated in several such heists for a fee of $5,000, driving up

in his Houston Police Department patrol car to make their activities look "official."

The October 1999 heist was a sting operation involving 41 officers and several law enforcement agencies. The motor home and the "stash house" were wired for video and audio surveillance, a tracking device was placed in the cocaine,[1] and the movements of the participants were further tracked by ground and helicopter units.

A jury found appellant guilty of burglary (assessing ten years in prison) and possession with intent to deliver at least four hundred grams of cocaine (assessing forty years in prison and a $10,000 fine). He presents three evidentiary questions on appeal, which we review for an abuse of discretion. *Burden v. State*, 55 S.W.3d 608, 615 (Tex.Crim.App.2001).

### *Prior Inconsistent Written Statement*

Appellant's first complaint concerns his attempt to impeach one of his associates, Michael Wagner, with a prior written statement. Shortly after the arrests, Wagner wrote a detailed, nine-page statement in which he attempted to prove the heist was a legitimate police raid and not a crime. After reaching a plea agreement with the State, Wagner abandoned this version of events and testified against appellant.[2]

During cross-examination, appellant's counsel questioned Wagner about the statement, and sought to introduce it in its entirety:

Q: Did you, up to the time that you cut a deal with the State, take the position and tell other people that, in fact, this was a legitimate drug arrest and y'all were a victim of circumstance?

A: [by Michael Wagner] Yes, sir.

. . .

Q: I'm handing you Defense Exhibit No. 1. That's something you and your brother prepared; is that correct?

A: Yes, sir, it is.

Q: And when did you and your brother prepare that?

A: This is back when I first got out of jail.

Q: All right. Now up to the time of you making a deal with the State for a reduced sentence, that was kind of your position in this thing, wasn't it?

A: Yes, sir.

[By defense counsel]: At this time I move to introduce Defendant's Exhibit No. 1.

The State's attorney objected:

[By prosecutor]: It's improper impeachment under Rule 613(a). He has unequivocally admitted this is his statement; therefore, no extraneous evidence of that statement is to be admitted before the jury . . .

The trial judge sustained the objection. The court also instructed counsel not to "go into" the contents of the statement, although it is not entirely clear whether counsel's request or the court's ruling per-

1. Five kilograms were actual cocaine on loan from a police lab; the remainder was simulated cocaine.

2. Michael Wagner was charged with burglary of a habitation, aggravated robbery, aggravated assault, felony theft, and possession of a controlled substance. In return for his testimony at appellant's trial, the State dismissed all charges against Wagner except for possession of cocaine, but did not agree to any recommendation regarding punishment for that charge.

tained to every line or only limited parts of the statement.[3]

■ Rule 613 prohibits extrinsic evidence of an inconsistent statement unless the witness denies it:

> In examining a witness concerning a prior inconsistent statement made by him, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of, such statement may be allowed, the witness must be told the *contents* of such statement and the *time and place and the person to whom it was made*, and must be afforded an opportunity to *explain or deny* such statement. If written, the writing need not be shown to him at that time, but on request the same shall be shown to opposing counsel. *If the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted* . . .

Tex.R. Evid. 613(a) (emphasis added). The rule is not as complicated as it looks; only three elements are required as a predicate for admission of a prior inconsistent statement:

- *identification* of the statement (by time, place, and person),
- a *summary* of the contents, and
- a *denial* by the witness as to what the statement contains.

---

**3.** THE COURT: Well, I sustain the objection to offering the total statement. Have you got anything else you want while the jury's out? If you want to—you can't just offer . . .

[APPELLANT'S COUNSEL:] I understand. I did not have to go through and read him each statement in there and ask him if he's ever said that before, and I think it would take up a lot of time of the court.

THE COURT: Now, you're not going to do that, not in front of the jury.

. . .

[COUNSEL:] The whole statement is [inconsistent]. I can go through item by item from what he just said.

THE COURT: I'm not going to argue with you. You've already developed in front of the jury that prior to the time that he entered his plea of guilty a few days ago and in response to the State's offer to reduce the charge and him be a witness, that his position was different. And I'm not going to let you go through this sentence by sentence or whatever it is. You've already developed that.

[COUNSEL:] No, sir. I respectfully would point out to the Court that he has taken the position that he was guilty of the offense and he knew what was going on and he had knowledge of it and that his brother had knowledge of it and Frank Ferguson had knowledge of it. Throughout this statement, it's replete with denying those contentions. It goes directly to his credibility, now that he has made statements that are directly contradicting what he said before, and it goes to his credibility, bias, intent.

THE COURT: Sustain the objection. You will not mention that exhibit in any way in front of the jury. Bring the jury in.

[COUNSEL:] Excuse me just a minute. Before you bring them, when you're saying that I can't, can I ask him direct questions about this?

THE COURT: No, sir. You have already asked him.

[COUNSEL:] I'm not arguing, your Honor. Is the instruction that I cannot refer to anything in Defendant Exhibit No. 1? Is that what you're instructing me, not to ask questions about the information contained in Defendant's Exhibit No. 1?

THE COURT: Well, counsel, you have—I mean, you know, you chose in the beginning to attempt to impeach him by the fact that until ten days ago, or whatever it was, his story was totally different.

[COUNSEL:] Yes, sir.

THE COURT: Now, I am not going to—I'm not going to let you go through this eight or ten page statement that he has.

. . .

THE COURT: . . . I'm not going to let you go through that statement sentence-for-sentence now.

[COUNSEL:] And I don't want to violate the Court's ruling, whatever it is.

THE COURT: I don't want you to either.

[COUNSEL:] I want the Court to tell me, am I instructed not to go into the contents of Defense Exhibit No. 1?

THE COURT: You're so instructed.

Here, counsel's cross-examination established only the first two—he identified the statement and summarized its contents. Because Wagner *admitted* the statement's contents, the trial court correctly refused to admit anything at that point.

But it was error if the trial court prevented any further questions about any part of the statement. In the statement, Wagner made direct references to appellant's innocence, declared the State's informant untrustworthy (giving reasons for that opinion), and alleged the police could not have known whether their actions were legitimate or criminal. He also explained his involvement, even though he was not a police officer. The jury heard none of these statements, and Wagner was never called upon to admit or deny their validity.

■ The trial court had discretion to prevent impeachment with every sentence in the nine-page statement, but not to limit cross-examination to the whole document rather than portions of it. *See McGary v. State*, 750 S.W.2d 782, 787 (Tex.Crim.App. 1988) (holding witness may be asked about portions of statement and, if denied, request admission of that portion).

Nevertheless, assuming this was the trial court's ruling, appellant has not shown how he was harmed. First, his counsel made no offer of proof detailing the questions he wanted to ask or the specific inconsistent statements he wanted to use for impeachment. *See* Tex.R. Evid. 103; Tex.R.App. P. 33.2. Indeed, when the trial judge invited him to do so, he insisted he wanted admission of the whole statement. Thus, it is impossible for us to assess harm without constructing the cross-examination ourselves, which we cannot do. Moreover, as discussed more fully below, appellant's involvement in this crime was confirmed by numerous witnesses (including several participants). We are convinced beyond a reasonable doubt that no impeachment us-

ing Wagner's statement would have altered the outcome of appellant's trial. *See* Tex.R.App. P. 44.2(a). We overrule appellant's first point of error.

### Understanding of the Law

■ In his next issue, appellant argues the trial court erred in limiting cross-examination of Eric Gibson, another accomplice who testified against him at trial. After questioning Gibson about his own plea agreement with the State, appellant asked Gibson the following question:

Q: Can you tell the jury what your understanding of deferred adjudication probation is?

The court sustained the State's objection to the question.

■ The question clearly asks for Wagner's opinion of a legal term. Opinion evidence as to legal terms is inadmissible. *See Mays v. State*, 563 S.W.2d 260, 263 n. 3 (Tex.Crim.App.1978). If what counsel *meant* to ask was whether Gibson thought he might escape jail time by changing his story, he should have asked that question. *See U.S. v. Wallace*, 32 F.3d 921, 926 (5th Cir.1994) (affirming limits on cross-examination of witness that allowed questions as to sentence he thought he might receive, but disallowed questions asking for legal conclusions); *U.S. v. Stafford*, 983 F.2d 25, 27 (5th Cir.1993) (affirming exclusion of written materials on tax law, but allowing witness to testify as to effect of materials on his beliefs). Because he did not, we hold the trial court committed no error.

### Out–of–Court Identification

■ In his final issue, appellant complains of the admission of an out-of-court identification. During the trial, Officer James Campbell testified that Francisco Perez identified appellant from a photo spread as a participant in a previous counterfeit raid. In response to appellant's

hearsay objection, the State asserted the identification was a present sense impression. *See* TEX.R. EVID. 803(1). The trial court overruled the objection.

This was not a present sense impression, as the statement was made long after the "raid" occurred. *Wood v. State,* 18 S.W.3d 642, 651–52 (Tex.Crim.App.2000) (holding statement not connected to contemporaneous observation was not present sense impression). Because Perez did not testify at trial, Officer Campbell's testimony was hearsay, and the trial court erred in overruling appellant's objection.

■ Nonetheless, we find the error harmless because it did not affect appellant's substantial rights or the jury's verdict. TEX.R.APP. P. 44.2(b); *see Johnson v. State,* 43 S.W.3d 1, 3–4 (Tex.Crim.App. 2001). Before Campbell testified, Eric Gibson admitted involvement in the previous "raid," and testified that appellant participated in it as well. Thus, Perez's identification was cumulative and harmless. *Se e Reyes v. State,* 84 S.W.3d 633, 638 (Tex.Crim.App.2002).

Moreover, the entire crime here was videotaped. It was undisputed that appellant drove his marked police car outside his assigned area and without permission; that he stopped the motor home, though there was no traffic violation to justify the stop; and that he then followed the other participants to the house where the money was located, leaving after receiving a sign from inside the house. Three associates testified to his involvement and his receipt of $5,000. Given appellant's use of his badge to commit crime rather than stop it, his sentence is no more (and perhaps less) than one might expect. We conclude that any error did not have a substantial and injurious effect on the jury's verdict.

The judgment is affirmed.

J. HARVEY HUDSON, J., corrected concurring opinion.

J. HARVEY HUDSON, Justice concurring.

As the majority has explained, Eric Gibson, an accomplice, was called by the State to testify against appellant. On direct-examination, Gibson admitted he had initially been charged with possession of cocaine with intent to deliver. Thus, he was subject to a potential punishment ranging from 15 years to life in the state penitentiary. Thereafter, in exchange for his testimony, the State agreed to reduce the charge to mere possession—thereby reducing the range of punishment to 10 years to life with a possibility of probation. The State also agreed to include a letter in Gibson's file detailing his cooperation with the State. Finally, the State was instrumental in reducing his bond to $20,000, permitting Gibson to get out of jail prior to sentencing.

On cross-examination, Gibson also admitted that part of his agreement with the State was that his maximum punishment would be "capped" at 30 years; thus, the actual range of punishment was 10 to 30 years in the penitentiary with a possibility of probation. Gibson further testified that he would be eligible for parole after serving one half of any sentence that might be imposed against him. Counsel pursued this inquiry as follows:

Q. [APPELLANT'S COUNSEL]: Mr. Gibson, had you been tried on the original charge, you would not be eligible for probation, would you?

A. No, I would not.

* * *

Q. And you won't be sentenced until you have concluded your agreement [to testify for the State]; is that correct?

A. That's correct.

Q. Let me ask you this: Has anybody explained to you or talked about the term, a "deferred adjudication probation"?

A. My lawyer has talked to me about that.

Q. Can you tell the jury what your understanding of deferred adjudication probation is?

[STATE'S ATTORNEY]: Object to the relevance of this, Your Honor.

THE COURT: Sustained.

[APPELLANT'S COUNSEL]: Judge, you know I won't argue with you, but it impacts on his making a decision; and if it's still the same ruling, I'll move on.

THE COURT: I've already ruled.

Under Texas law, a witness may not give legal conclusions or interpret the law to the jury. *United Way of San Antonio, Inc. v. Helping Hands Lifeline Found., Inc.,* 949 S.W.2d 707, 713 (Tex.App.-San Antonio 1997, writ denied). Moreover, a lay witness's opinion expressed in terms of legal definitions and conclusions ordinarily should be excluded. *Lum v. State,* 903 S.W.2d 365, 369 (Tex.App.-Texarkana 1995, pet. ref'd). A defendant, however, is entitled to pursue all avenues of cross-examination reasonably calculated to expose a motive, bias or interest for the witness to testify. *Lewis v. State,* 815 S.W.2d 560, 565 (Tex.Crim.App.1991). Moreover, evidence to show bias or interest of a witness in a cause covers a wide range, and the field of external circumstances from which probable bias or interest may be inferred is infinite. The rule encompasses all facts and circumstances which, when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of the cause only. *Jackson v. State,* 482 S.W.2d 864, 868 (Tex. Crim.App.1972).

Here, the actual meaning and legal effect of deferred adjudication were not at issue. Because the witness could only be influenced by what he *believed* the law to be, counsel's inquiry was a rational, highly relevant attempt to expose any bias the witness may have had in testifying for the State. Under the circumstances, it made no difference whatsoever whether the witness' understanding of deferred adjudication was accurate or erroneous. The relevant inquiry was simply whether the witness might be biased by *his* understanding of deferred adjudication. Accordingly, I would find the trial court erred in sustaining the State's objection.

In determining whether an improper limitation of cross-examination requires reversal, an appellate court must consider the following factors: (1) the importance of the witness's testimony in the State's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the State's case. *Shelby v. State,* 819 S.W.2d 544, 547 (Tex.Crim.App.1991); *Drew v. State,* 76 S.W.3d 436, 451 (Tex. App.-Houston [14th Dist.] 2002, pet. ref'd). Here, Gibson's testimony was cumulative and relatively unimportant to the State in light of the testimony of other witnesses and the corroborative effect of the surreptitiously recorded videotape showing the commission of the offense. Accordingly, the error was harmless beyond any reasonable doubt.

With these observations, I respectfully concur in the Court's judgment.