

# NUMBER 13-08-00530-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE MATTER OF E.S., III, A CHILD

### On appeal from the County Court at Law No. 2
### of Victoria County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Chief Justice Valdez**

After a bench trial, the trial court found that appellant, E.S.,III ( "E.S.")[1] committed

two counts of deadly conduct. *See* TEX. PENAL CODE ANN. § 22.05(b) (Vernon 2003). E.S.

was ordered committed to the Texas Youth Commission (TYC) for a determinate sentence

of ten years. In two issues, E.S. contends that: (1) the evidence is insufficient to support

the trial court's judgment; and (2) the trial court erred by considering a hearsay statement.

We affirm.

---

[1] We will refer to the juvenile subject to this appeal and his father by aliases only. *See* TEX. R. APP.
P. 9.8(c).

# I. Background

A little after 8:00 p.m., on the evening of July 9, 2008, Ramona Nunez sat on a chair in her front yard visiting with two grandchildren under the age of ten, her sixteen-year-old grandchild, J.A., and his teenage friend, J.G. Although the sun had set, it was not yet dark, and she noticed a blue station wagon driving down the street in front of her home. She informed J.A., who was seated at a nearby picnic table, that the station wagon was "coming real slow." The car stopped, with its passenger side immediately in front of the house. The driver, identified as E.S., reached across the passenger and began firing a gun. After firing two to four shots, E.S. drove away.

Nunez phoned 911, and officers were dispatched to her residence. Scared that the blue station wagon might return, J.A. and J.G. departed from Nunez's home before the police arrived. Officer John Turner was the first to arrive.

Officer Turner testified that upon his arrival, Nunez informed him that a blue station wagon had driven in front of her house and that E.S. had fired shots from the vehicle. Officer Turner searched the front yard and found a "crack" or "chip" in the windshield of a truck parked in Nunez's front yard. Officer Turner testified that the damage to the windshield indicated that a "projectile" such as a "bullet, BB, rock or something of that nature" had hit and "bounced off" the windshield. No bullets, fragments, or casings were found at the scene.

Officer Zachary De La Rosa testified that on the way to Nunez's residence, he received a radio alert that E.S. had been involved in the shooting. After using his computer to locate E.S.'s address, Officer De La Rosa proceeded to E.S.'s residence. Later testimony revealed that although E.S.'s residence was a "number of blocks away" from Nunez's residence, it was "not very far." While en route, Officer De La Rosa spotted a blue

2

station wagon parked in a field across from E.S.'s home. Officer De La Rosa saw no one around the vehicle and was unable to tell whether anyone was inside. Before Officer De La Rosa could reach the station wagon, a train crossed the tracks in front of him, blocking his route. Officer De La Rosa turned and proceeded further down the road, parallel to the tracks until he was able to find a place to cross. He drove back towards E.S.'s residence. Upon his arrival, Officer De La Rosa observed that the station wagon was no longer parked in the field across from E.S.'s residence, but rather, was parked either in the driveway of, or on the street near, E.S.'s residence. As he approached the station wagon, he saw three males at a distance of forty to fifty yards away from the vehicle, running away from it. Officer De La Rosa exited his vehicle and ran to apprehend the suspects. Officer De La Rosa eventually apprehended A.R., a friend of E.S., and the two other suspects, D.W. and T.T., were apprehended by other officers.

Officer Mark Pullin, while en route to Nunez's residence, heard over his radio that suspects believed to have been involved in the shooting had fled from a blue station wagon. Officer Pullin proceeded to assist other officers in apprehending the three suspects seen fleeing the station wagon. After the suspects were apprehended, Officer Pullin secured the station wagon. Officer Pullin found the vehicle parked near E.S.'s residence; the driver's side door was "slightly ajar," and the vehicle was making a "dinging sound" because the keys had been left in the ignition. While conducting a search of the vehicle, Officer Pullin found a spent .22 casing on the floorboard of the back seat, directly behind the driver's seat. A gun was never found, and neither the car nor the casing were dusted for fingerprints.

After securing the vehicle, Officer Pullin located E.S. at his residence. Upon questioning by Officer Pullin, E.S. denied owning a gun or having any firearms in his home;

3

upon Officer Pullin's request to search his home, E.S. refused. E.S. told Officer Pullin that he had been at his house all day playing video games with "a white boy," but was unable to describe the "white boy" or give his name. Fearing lack of probable cause, Officer Pullin did not arrest E.S.

After presenting the testimony of A.R., the first suspect apprehended, Nunez, J.A., J.G., and the foregoing officers, the State rested its case. E.S.'s father, Eddie, then testified for the defense. Eddie stated that on July 9, 2008, he was at home "all day and all night." Eddie stated that at the time of the alleged shooting, E.S. was asleep on the couch in the living room, and that E.S. was home the entire night. Eddie testifed that he did not speak to police when they came to the home and spoke with E.S. that night, because he had not seen them. Additionally, Eddie testified that if the police had come to his residence that night, it was for "[n]othing serious," because, had it been a serious matter, "they would have called [him] outside." He also stated that J.G. had made threats to him in the past, and that after the alleged shooting, J.A. and J.G. exhibited a gun in his presence.

After considering the foregoing testimony, the trial court found that E.S. committed the offense of deadly conduct as to Nunez and J.A.[2] The court then ordered E.S. committed to TYC for a determinate sentence of ten years. This appeal ensued.

## II. SUFFICIENCY

In his first issue, E.S. contends that the evidence is insufficient to support the trial court's judgment that he engaged in deadly conduct. Although E.S. sets forth the legal sufficiency standard of review, his sub-issues present factual sufficiency arguments. Therefore, out of an abundance of caution, we construe E.S.'s arguments as a challenge

---

[2] Nunez and J.A. were the only alleged victims for whom a determinate sentence was sought.

to legal and factual sufficiency.

## A.	Standards of Review and Applicable Law

In conducting a legal sufficiency review, we must ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '*it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original)). We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151. We must resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In conducting a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or the jury's verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). We will not reverse the jury's verdict unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the verdict. *Id.* at 417.

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). The hypothetically correct jury charge for deadly conduct requires proof that a

person knowingly discharges a firearm at or in the direction of: (1) one or more individuals, or (2) a habitation, building, or vehicle and is reckless as to whether the habitation, building, or vehicle is occupied. TEX. PENAL CODE ANN. §22.05(b). A person acts knowingly, or with knowledge, "when he is aware of the nature of his conduct or that the circumstances exist" or "he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b) (Vernon 2003). A person acts recklessly, or is reckless, when "he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c).

## B.    Analysis

E.S. argues that the evidence is insufficient because: (1) "there was no tangible evidence to support the allegation"; (2) "the State's eyewitnesses were not credible"; and (3) E.S. "had an alibi for the time of the shooting." We disagree.

Nunez, J.A., and J.G. each testified that on the evening of July 9, 2008, a blue station wagon, driven by E.S., stopped in front of Nunez's home, and E.S. pointed a gun out of the passenger side window and fired two to four shots. Nunez testified that at the time of the shooting, she was able to identify E.S. because he "used to go to [her] house" and she knew his grandparents. J.A. testified that, despite the bottom of E.S.'s face being covered by a bandana, he was able to identify E.S. as the gunman because he and E.S. had been friends "a year or two" prior to the shooting. J.G. testified that he recognized E.S. because he and E.S. had been friends a few years before the shooting. Additionally, officers testified that after the alleged shooting, they found a cracked windshield on a truck parked at Nunez's home. The officers also testified that shortly after the shooting, they located a blue station wagon, which matched the description of the one allegedly driven by E.S. during the shooting. The blue station wagon was found near the driveway of E.S.'s

6

residence, and a spent .22 caliber casing was found behind the driver's seat.

Viewed in the light most favorable to the verdict, from the testimony and facts surrounding the shooting, a rational trier of fact could have found that E.S. knowingly discharged a firearm in the direction of Nunez and J.A. Accordingly, we conclude that the evidence was legally sufficiency to support E.S.'s conviction. *See Laster*, 275 S.W.3d at 517-18.

E.S.'s father, Eddie, testified that E.S. was at home on the night of July 9, 2008. E.S. argues that the only evidence linking him to the shooting was the testimony of Nunez, J.A., and J.G., and that these alleged eyewitnesses are not credible. E.S. specifically argues that Nunez's testimony of the events on July 9, 2008 is contradictory to the events she described to officers when they arrived on the scene. Officer Turner testified that when he spoke to Nunez upon responding to her 911 call, Nunez did not tell him that J.G. had been at her home at the time of the shooting. However, at trial, Nunez insisted that J.G. was at her home at the time of the shooting, and that she had told police about him. Additionally, Nunez told officers at the scene that E.S. was seated in the passenger seat of the blue station wagon and that there were only three individuals in the car at the time of the shooting (two in the front seat and one in the backseat). At trial, Nunez testified that E.S. was the driver of the blue station wagon and that there were four individuals in the vehicle (two in the front seat and two in the back seat).

Reconciliation of conflicts in the evidence is within the exclusive province of the fact finder. *See Mosley v. State*, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998). Viewing the evidence in a neutral light, we conclude that the evidence is not so weak that the conviction seems clearly wrong and manifestly unjust, and the trial court's determination is not against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414-15.

7

We conclude that the evidence is factually sufficient to support E.S.'s conviction. Having determined that the evidence is legally and factually sufficient to support E.S.'s conviction, we overrule his first issue.

### III. IMPEACHMENT BY PRIOR INCONSISTENT STATEMENT

In his second issue, E.S. contends that the trial court erred by considering Officer De La Rosa's testimony concerning statements made to him by A.R.

**A.     Standard of Review and Applicable Law**

We review a court's evidentiary rulings under an abuse of discretion standard. *See Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002); *In re Estate of Robinson*, 140 S.W.3d 782, 790 (Tex. App.–Corpus Christi 2004, pet. denied). The impeachment of a witness with a prior inconsistent statement is governed by rule 613(a), which provides:

> In examining a witness concerning a prior inconsistent statement made by the witness, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of, such statement may be allowed, the witness must be told the contents of such statement and the time and place and the person to whom it was made, and must be afforded an opportunity to explain or deny such statement. . . . If the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted.

TEX. R. EVID. 613(a).

To lay the foundation required by rule 613(a), the party seeking to impeach must establish: (1) an "identification of the statement (by time, place, and person)"; (2) "a summary of the contents"; and (3) "a denial by the witness as to what the statement contains." *See Ferguson v. State*, 97 S.W.3d 293, 296 (Tex. App.–Houston [14th Dist.] 2003, pet. ref'd); *Downen v. Texas Gulf Shrimp Co.*, 846 S.W.2d 506, 512 (Tex. App.–Corpus Christi 1993, writ denied).

A violation of the evidentiary rules resulting in the erroneous admission of evidence

is non-constitutional error. *See Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002) (en banc) (noting that "[e]rroneous evidentiary rulings rarely rise to the level of denying . . . fundamental constitutional rights"); *see Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (applying rule 44.2(b) to determine whether the admission of inadmissible hearsay affected the appellant's substantial rights). We disregard errors, defects, irregularities, or variances that do not affect the substantial rights of the accused. TEX. R. APP. P. 44.2(b); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). A substantial right is affected when, after reviewing the record as a whole, a court concludes that the error has a substantial and injurious effect or influence on the outcome of the proceeding. *See Burnett v. State,* 88 S.W.3d 633, 637 (Tex. Crim. App. 2002); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

## B.    Analysis

During its case in chief, the State called E.S.'s friend, A.R., to testify regarding the July 9, 2008 incident. After identifying the time and place, and identifying "the officer" as Officer De La Rosa, the State questioned A.R. as follows:

> [State]:     And do you remember telling the officer that you were
>                  picked up by [E.S.] in a vehicle?
>
> [A.R.]:      I don't recall that.
>
>                   . . . .
>
> [State]:     Okay. Do you recall telling the officer that [E.S.] was driving
>                  a vehicle and that he gave you and your homeboy a ride,
>                  your homeboy [T.T.]? Do you remember telling the officer
>                  that?
>
> [A.R.]:      No.
>
> [State]:     Do you remember telling the officer that [D.W., another
>                  occupant of the vehicle] kept yelling "we got them niggas"?

[A.R.]:        No.

[State]:       Do you remember telling the officer that when you asked him who they got they replied Chucky?

[A.R.]:        No.

[State]:       You don't remember telling them that either?

[A.R.]:        No.

[State]:       Do you remember telling the officer that you told [E.S.] that you didn't want to be involved in anything like that because you had already been shot twice?

[A.R.]:        No.  No.

[State]:       You don't remember telling them that either?

[A.R.]:        Well, whoever told you that that's [sic] a lie because I never been shot twice.

[State]:       Did you remember telling the officer that or not?

[A.R.]:        No.

The State then called Officer De La Rosa who testified, over a hearsay objection, as follows:

[State]:                    What did [A.R.] tell you?

. . . .

[Officer De La Rosa]:      . . . . And [A.R.] advised that he and his cousin who he called [T.T.] . . . were walking on 800 East Forrest when the—when the blue station wagon that was located there had pulled up around the street really fast.  He then advised me that the car was occupied by [E.S.] and [D.W.] and that [E.S.] was driving. [E.S.] asked [A.R.] and [T.T.] if they wanted to ride with him. [A.R.] advised that they accepted the ride and they got into the car.  [A.R.] advised that [E.S.] and [D.W.] kept yelling, and I quote[,] "We got them niggas.  We got them [n]iggas." [A.R.] had asked who they got and they replied "Chucky."

10

[A.R.] advised that he told them that he did not want to be involved in anything like that because he had already been shot twice and didn't want anyone to think that he had something to do with it. [A.R.] advised that he was then—that someone noticed the police car, which I guess and I assume would be my car, and he told them he had warrants and he had to get out of there and then they ran.

In his first sub-issue, E.S. argues that Officer De La Rosa's testimony regarding A.R.'s prior statements to him constitutes inadmissible hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial, which is offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d). A prior statement that is offered to impeach the witness's credibility is not hearsay. *Flores v. State*, 48 S.W.3d 397, 404 (Tex. App.–Waco 2001, pet. ref'd). Upon E.S.'s hearsay objection to Officer De La Rosa's testimony, the State argued that the testimony did not constitute hearsay because it was a "prior inconsistent statement." A witness may be impeached by a prior inconsistent statement if the predicate provided by rule 613(a) is met. *See* TEX. R. EVID. 613(a). E.S. does not challenge that the rule 613(a) predicate was met; instead, he fails to recognize rule 613(a) as a grounds through which a hearsay statement may be properly admitted. Accordingly, Officer De La Rosa's testimony does not constitute inadmissible hearsay if it is considered solely for impeachment. *See Flores*, 48 S.W.3d at 404.

In his second sub-issue, E.S. argues that the trial court considered Officer De La Rosa's testimony for the truth of the matter asserted, and that such consideration constitutes harmful error. Assuming, without deciding, that the trial court considered the complained-of testimony for the truth of the matter asserted, we would nonetheless conclude that any error was harmless given the overwhelming evidence of E.S.'s guilt that was properly introduced. *See* TEX. R. APP. P. 44.2(b); *Solomon*, 49 S.W.3d at 365;

11

*Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000) (noting that "the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error"). As previously discussed, three eyewitnesses identified E.S. as the gunman at the time of the shooting, and a vehicle matching the description of the vehicle driven by the gunman was found in close proximity of E.S.'s residence. Thus, in light of this properly admitted evidence and viewing the record as a whole, we have a fair assurance that any purported error in relation to the admission of Officer De La Rosa's statement neither influenced the fact finder nor had more than a slight effect. *See Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004). E.S.'s second issue is overruled.

## IV. CONCLUSION

Having overruled E.S.'s issues, the trial court's judgment is affirmed.

ROGELIO VALDEZ,
Chief Justice

Memorandum Opinion delivered and
filed this 26th day of August, 2009.

12