ACCEPTED
06-14-00096-cv
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
5/26/2015 4:11:56 PM
DEBBIE AUTREY
CLERK

**NO. 06-14-00096-CV**

_____

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
5/27/2015 8:58:00 AM
DEBBIE AUTREY
Clerk

IN THE COURT OF APPEALS FOR THE SIXTH DISTRICT, TEXARKANA, TEXAS

_____

**MICHAEL ANDERSON**
*Appellant,*

v.

**THOMAS SNODDY**
*Appellee.*

_____

On Appeal from Cause No. 548-12
In the 115th Judicial District Court of Upshur County, Texas
Honorable Lauren Parish, Presiding Judge

_____

**APPELLANT'S BRIEF**

_____

Jonathan Wharton
SNOW E. BUSH, JR., P.C.
Texas State Bar No. 24075764
420 N. Center Street
Longview, TX 75601
Tel. (903) 753-7006
Fax (903) 753-7278
jonathanwharton1@sbcglobal.net
**ATTORNEY FOR APPELLANT**
MICHAEL ANDERSON

May 26, 2015

*ORAL ARGUMENT REQUESTED*

# IDENTITY OF PARTIES AND COUNSEL

Pursuant to Rule 38.1(a) of the Texas Rules of Appellate Procedure, Appellant lists the following parties affected by this appeal, and their respective appellate and trial counsel:

<u>Appellant: Michael Anderson</u>

Jonathan Wharton
Snow E. Bush, Jr., P.C.
420 N. Center Street
Longview, TX 75601
903.753.7006
Fax 903.753.7278
jonathanwharton1@sbcglobal.net
**Trial and Appellate Counsel for Michael Anderson**

<u>Appellee: Thomas Snoddy</u>

L. Charles Van Cleef
P.O. Box 2432
Longview, TX 75606-2432
903.248.8244
Fax 903.248.8249
charles@vancleef.pro
**Trial and Appellate Counsel for Thomas Snoddy**

# TABLE OF CONTENTS

**IDENTITY OF PARTIES AND COUNSEL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**INDEX OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**REQUEST FOR ORAL ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**ISSUES PRESENTED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**SUMMARY OF THE ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**PRAYER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**APPENDIX** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# INDEX OF AUTHORITIES

## STATUTES

Tex. Code Crim. Pro., Art. 17.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Tex. Code Crim. Pro., Art. 17.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Tex. Code Crim. Pro., Art. 17.141 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Tex. Occ. Code § 1704.051 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Tex. Occ. Code § 1704.052 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Tex. Occ. Code § 1704.105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Tex. Occ. Code § 1704.151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Tex. Occ. Code § 1704.154 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## RULES

Tex. R. Crim. Evid. 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Tex. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 39

Tex. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Tex. R. Evid. 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Tex. R. Evid. 405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Tex. R. Evid. 611 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 37

Tex. R. Evid. 613 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

Tex. R. Evid. 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35

Tex. R. App. P. 44.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**CASES**

Anderson v. Snider, 808 S.W.2d 54 (Tex. 1991) . . . . . . . . . . . . . . . . . . . . . . . 43

Aranda v. State, 736 S.W.2d 702 (Tex. Crim. App. 1987) . . . . . . . . . . . . . . . . . . 31

Brown v. Russell, 703 S.W.2d 843 (Tex. App.—Ft. Worth 1986, no writ) . . . . . . 36

Cooper v. Circle Ten Council Boy Scouts of Am., 254 S.W.3d 689 (Tex. App.—
Dallas 2008, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Del Carmen Hernandez v. State, 273 S.W.3d 685 (Tex. Crim. App. 2008) . . . . . . . 33

Ferguson v. State, 97 S.W.3d 293 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 34

Fibreboard Corp. v. Pool, 813 S.W.2d 658 (Tex. App.—Texarkana 1991, writ denied)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

In re Ford Motor Co., 988 S.W.2d 714 (Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . 42

Ho v. State, 171 S.W.3d 295 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) . 40

Moreno v. State, 900 S.W.2d 357 (Tex. App.—Texarkana 1995, no pet.) . . . . . . 37

Quintero v. Citizens and S. Factors, Inc., 596 S.W.2d 277 (Tex. Civ. App.—Houston
[1st Dist.] 1980, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Republic Waste Services, Ltd. v. Martinez, 335 S.W.3d 401 (Tex. App.—Houston
[1st Dist.] 2011, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Smith v. State, 919 S.W.2d 96 (Tex. Crim. App.1996) . . . . . . . . . . . . . . . . . . . . . 45

State v. Wilemon, 393 S.W.2d 816 (Tex. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Stewart v. State, 129 S.W.3d 93 (Tex. Crim. App. 2004) . . . . . . . . . . . . . . . . . . . . 40

Sw. Bell Tel. Co. v. Vollmer, 805 S.W.2d 825 (Tex.App.—Corpus Christi 1991, writ denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Thomas v. State, 811 S.W.2d 201 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 45

Williams v. State, 332 S.W.3d 694 (Tex. App.—Amarillo 2011, pet. denied) . . . . 42

5

## STATEMENT OF THE CASE

This suit was filed for breach of contract, breach of fiduciary duty, fraud, and tortious interference with prospective business relationships. CR 32-37. After a jury trial, a verdict for the defense was returned. CR 67-74. The court rendered a take-nothing judgment based on that verdict. CR 81-82.

## REQUEST FOR ORAL ARGUMENT

Because the fact pattern is complex and the issues presented are uncommon, the court's decisional process would benefit from oral argument.

## ISSUES PRESENTED

1.  Is cross-examination on prior inconsistent statements limited to identical questions and statements; that is, must the current statement and the prior inconsistent statement be responsive to the same exact question?

2.  Is the trial court permitted to instruct the jury that an attorney's cross-examination is "improper impeachment"?

3.  Were the judgments nisi offered by the Appellant relevant?

4.  Should the Appellant have been permitted to cross-examine the Defendant on the factors that determine whether a partnership exists?

5.  May a witness testify that a "party" accused of misconduct has never been underhanded in business before?

6.  Did the combined effect of the errors in the trial harm Appellant?

## STATEMENT OF FACTS

Michael Anderson began bounty hunting part-time in the 90s during college. 3 RR 34 & 37. He met Gary Roberts, a private investigator, around 1996. 3 RR 30. After working with Mr. Roberts for about a year and a half, Mr. Anderson became a police officer and then enlisted in the army. 3 RR 33-34. In 2005, after eight years in Iraq, he came back to the states and began doing bounty hunting again. 3 RR 36-37. Four years later, in 2009, he got a call from Mr. Roberts saying that there is a bail bond office that could use his help. 3 RR 37-38.

Mr. Roberts had been offered a partnership in Gilmer, Texas. 3 RR 30-31. Thomas Snoddy told Mr. Roberts that he had a bail bond office and they would split profits fifty/fifty. 3 RR 30. Mr. Roberts did not have enough time to devote, so he turned the partnership offer over to Mr. Anderson. 3 RR 31-32.

Mr. Anderson went to meet Mr. Snoddy. 3 RR 38. Mr. Snoddy said that his Upshur County office was not making any money, so he would rather bring someone else in as a partner. 3 RR 38. Mr. Snoddy would show Mr. Anderson how the business works. 3 RR 38. Mr. Anderson would do the daily work and Mr. Snoddy would provide the financial backing necessary to sign off on bonds. 3 RR 40-41. Mr. Snoddy did not say anything about someone else owning the business or the arrangement being anything other than a partnership. 3 RR 38-39.

7

The business was named Fast Action Bail Bonds. Mr. Anderson began signing for bonds in December of 2009. 3 RR 38. On average, Fast Action Bail Bonds would have six to eight hundred thousand dollars in outstanding bonds, with at most $1.2 million. 3 RR 41. Per their agreement, Mr. Anderson sent Mr. Snoddy approximately $76,000 over the course of their two-and-a-half-year business relationship. 5 RR 164. Mr. Snoddy assured Mr. Anderson that he was financially backing the business. 3 RR 42.

In 2011, Mr. Anderson received a strange phone call from a man who introduced himself by first name only. 3 RR 42-43. "Harold" told Mr. Anderson that he, Harold, was the owner of the business. 3 RR 119. That raised some obvious questions for Mr. Anderson.

At the same time, Mr. Anderson discovered some troubling information about Fast Action's financial status with the sheriff's office. Mr. Anderson had been attending legislatively-mandated bail bond law courses. 3 RR 45-45; Tex. Code Crim. Pro., Art. 17.10(b). There, he learned how sureties maintain their eligibility to work in a county.

Certain counties are regulated by bail bond boards. In larger counties, a bail bond board must be created. Tex. Occ. Code § 1704.051. Smaller counties may choose to create their own as well. Tex. Occ. Code § 1704.052. The bail bond board

8

licenses bail bondsmen that are eligible to work in the county. Tex. Occ. Code § 1704.105. Only licensed bondsmen may act as a surety in the county. Tex. Occ. Code § 1704.151. The licensing requirements are strict, including an application in which the bondsman executes nonexempt property in trust to the board to satisfy forfeitures. Tex. Occ. Code § 1704.154.

Upshur County is not a bail bond board county. 3 RR 46. By law, the judge in each case is supposed to require evidence proving that the surety can satisfy any possible forfeiture. Tex. Code Crim. Pro., Art. 17.11, Sec. 1. In practice, the trial court does not examine the surety's net worth in every case. Instead, the sheriff creates a list of pre-approved bondsmen who have shown to him that they are financially sound. 3 RR 46-47; Tex. Code Crim. Pro., Art. 17.141. There is a requirement for the sureties, though: "Each surety listed under this article must file annually a sworn financial statement with the sheriff." Tex. Code Crim. Pro., Art. 17.141.

Mr. Anderson's concerns led him to request the financial statements on file with the Upshur County Sheriff. 3 RR 48. He found out that there were no current statements. 3 RR 48. Fast Action Bail Bonds' only record was a 2006 fax from "Snoddy Bail Bonds" with a financial statement from 2003 for a man named Gerald Todd. 3 RR 48; Plaintiff's Exhibit 21. This discovery was made in 2012, so the one-

9

year time period listed in Tex. Code Crim. Pro., Art. 17.141 had more than expired. 3 RR 50. Not only that, but the business (Snoddy Bail Bonds) was different than Fast Action Bail Bonds, and the financial records were for a man named Gerald Todd that Mr. Anderson had never heard of. 3 RR 51.

At that point, Mr. Anderson realized that he had signed on a million dollars of bonds without proper financial backing. 3 RR 52. Mr. Snoddy's name was not signed to any of the bonds, nor was his name on any document filed in Upshur County. 3 RR 52. Even the assumed name certificate for Fast Action Bail Bonds, which Michael Anderson had filed on the advice of Mr. Snoddy, did not list Mr. Snoddy as having any involvement in the business. Defendant's Exhibit 1; 3 RR 195-96.

Mr. Anderson broke off his business relationship with Mr. Snoddy. 3 RR 54-55; Plaintiff's Exhibit 2. In response, Mr. Snoddy transferred the Fast Action Bail Bonds telephone numbers from Mr. Anderson's office to his own. 3 RR 57. Verizon's records showed that from August 14, 2007, until August 13, 2012, the telephone numbers in question (903-843-9814 and 903-843-4900) had "Fast Action Bail Bonds" as the subscriber. Plaintiff's Exhibit 25 at 2. After the breakup between Mr. Anderson and Mr. Snoddy, the subscriber became "Bad Boys Bail Bonds," one of Mr. Snoddy's other businesses. Plaintiff's Exhibit 25 at 2. The phone transfer entirely stopped Mr. Anderson's business until he could get a replacement, as his business

10

comes in by phone. 3 RR 63-64. Nevertheless, he obtained new numbers and continued running the business on his own. 3 RR 56.

After the instant suit was filed for failing to provide a surety and wrongfully transferring the phone lines, Mr. Snoddy forwarded the phone lines to a gentleman by the name of Barry Lovely. 4 RR 20-21. Mr. Lovely was a bondsman who worked out of Harrison County.[1] 4 RR 142. Nevertheless, he began taking bail bond business through the Upshur County phone numbers. 4 RR 138. According to one witness, a bus driver called Norman Chism, Mr. Lovely was answering the telephone lines as "Michael Anderson." 3 RR 204-206. The advertisements that were in the newspaper showed Mr. Anderson's name and picture for the business, so it behooved him to answer as the advertised individual. Plaintiff's Exhibit 20.

Mr. Chism called the number, which was answered by "Michael Anderson." 3 RR 206. He set up a meeting with "Michael Anderson" at the Taco Bell because "Michael Anderson" did not have an office in Gilmer. 3 RR 206-07. Mr. Chism then walked to the advertised address for Fast Action Bail Bonds and met the actual Michael Anderson. 3 RR 207. Mr. Chism told what happened to Mr. Anderson, who showed up at the Taco Bell along with Mr. Lovely, and there was an argument. 3 RR 67-68.

[1]At the time of trial, Mr. Lovely worked at Schlotzky's, a sandwich shop. 4 RR 123.

Mr. Lovely did not deny that he received the phone call: he was even able to identify Mr. Chism's race over the phone as African American. 4 RR 139. Mr. Lovely testified to a similar course of events as Mr. Chism:

> He call me, he say, hey, Barry, is this Barry, I got your money, I was told to bring you some money. He says where is your office. I say I don't have a office in Gilmer. I say I'm coming out of Longview now. He say where can I meet you. I say, well, meet me at Taco Bell. . . . And when I got to Taco Bell Mr. Anderson was there.

4 RR 147. The primary difference is that Mr. Lovely denied impersonating Mr. Anderson and he presented the call as a set-up instead of a genuine customer call. 4 RR 151-52.

Mr. Snoddy denied any knowledge about the impersonation except that it was "child's games" being played by Mr. Anderson. 4 RR 29. He asserted that it was a set-up. 4 RR 29. He contended that he personally owned the phone numbers and he could do what he wanted with them. 4 RR 92.

As far as the breach of the partnership agreement, Mr. Snoddy's response was that he was not a partner but simply a consultant. 4 RR 19. He denied offering a partnership to Gary Roberts or Michael Anderson. 3 RR 291-92. Mr. Snoddy maintained that there was a surety for the business. Yet when there were bond forfeitures, the business itself would pay them from its profits: the alleged surety would not pay. 4 RR 30-32. Documents he generated said that he received 50% of the

profits from the business; 35% of that 50% (or 17.5% of the total profits from the business) was sent to the surety. Plaintiff's Exhibit 5. Yet Mr. Snoddy did not know who the surety was. In deposition, Mr. Snoddy claimed that Harold Stein was the surety for Fast Action Bail Bonds. 3 RR 327. Mr. Snoddy said that Mr. Stein owned the business. 3 RR 269-70. Mr. Snoddy said that he sent all the surety payments to Mr. Stein. 3 RR 270. Mr. Snoddy also denied knowing who Gerald Todd is. 3 RR 327. He said that he did not know Gerald Todd's address, phone number, he did not know how he was paid, and he did not even know if he was paid to be a surety. 4 RR 30. Mr. Snoddy did not list Gerald Todd as a person with knowledge of relevant facts. 4 RR 51-52. Mr. Snoddy claimed to have no knowledge about the financial statement from Gerald Todd that was sent to the Upshur County Sheriff.4 RR 52. He did not know who sent the fax. 4 RR 52. Mr. Snoddy said that it could have been Mr. Stein that sent it from Mr. Snoddy's office. 4 RR 83-84.

Mr. Stein testified that he was not the owner or surety for Fast Action Bail Bonds. 3 RR 270-271. He has not acted as a surety in over twenty-five years. 3 RR 216. At his deposition, he denied any knowledge about the structure of Fast Action Bail Bonds. 3 RR 224. He claimed to have no idea what the case was about. 3 RR 224. He had never even been in a business relationship with Mr. Snoddy. 3 RR 218. His only business dealing in Upshur County was to advertise some phone numbers

13

because he has a broker business in Dallas in which he sometimes refers people to a bondsman in Upshur County. 3 RR 285 at 3-12.

Gerald Todd was not listed as a witness by either party and he was not called at trial. CR 38 & 57. In cross-examining Mr. Anderson, after only Gary Roberts had testified, Mr. Snoddy's attorney prepared a chart that showed Gerald Todd as the surety for Fast Action Bail Bonds. 3 RR 116-123. Mr. Stein then testified that Gerald Todd was the surety for Fast Action Bail Bonds. 3 RR 221. In response to a question about whether he has any documentation for his assertion, he said that "I didn't know he was involved until you showed me that chart [prepared by the Defendant's attorney]." 3 RR 226 at 2-10; 3 RR 116-123 (creation of chart). Mr. Stein said that he (Mr. Stein) worked for a company called "Surety Company." 3 RR 218. The company received payments, not Harold Stein; when Mr. Stein denied ever receiving checks for the surety in his deposition, he meant that he did not receive the checks personally: "Surety Company" received the checks. 3 RR 248. According to Mr. Snoddy, Gerald Todd would be the effective surety for the business, even if Mr. Todd did not know that they were using his financial statements, as long as the financial statements were at the sheriff's office. 4 RR 33-34.

Neither Mr. Snoddy nor Mr. Stein brought checks or other proof of payment to trial. 3 RR 294. Sum total, Mr. Snoddy's records reflected payments of

14

approximately $27,000 to the alleged surety (35% of the $76,500 sent to Mr. Snoddy). 5 RR 164; Plaintiff's Exhibit 5. Mr. Snoddy said that he could not remember what account he sent the money to; he said sometimes he sent checks, sometimes cash. 4 RR 6. Either way, he no longer has any bank records reflecting payments. 4 RR 7. His banker disagreed, stating that the records were in fact available to Mr. Snoddy. 4 RR 219. The checks had been requested in discovery, to which Mr. Snoddy responded that "I do not have these, I am not even sure payments were made by check." 3 RR 293.

According to Mr. Snoddy's attorney, the lawsuit arose because Mr. Anderson does not understand "everything that goes on behind this because this is a high, high finance business. It's not a hot dog stand, okay. . . . It's more like an insurance company than a hot dog stand and that's how it's being presented to you is a hot dog stand. I don't understand where the hot dogs come from, who made the hot dogs. The evidence is going to show that it's not that simple and that even as we stand here today Mr. Anderson and Mr. Wharton who I get along with famously do not understand the business." 3 RR 22-23. "Mr. Anderson would have you believe that as the sack boy at Brookshire's it's important that he know the name and address of the owners of the Brookshire's grocery store company. That's not the way it works." 3 RR 22.

The jury returned a verdict that Mr. Anderson and Mr. Snoddy did not enter into a partnership agreement, Mr. Snoddy had not committed a fraud, and neither Mr. Snoddy nor Mr. Lovely tortiously interfered with Mr. Anderson's business. CR 67-74. The trial court rendered a take-nothing judgment based on that verdict. CR 81-82.

## SUMMARY OF THE ARGUMENT

The trial court's interruptions, admonitions, and limitations on the plaintiff's cross-examination of the defense witnesses were improper. The scope of cross-examination is relevance: inquiry is allowed into any relevant matter. Certain procedures must be followed when impeaching a witness with prior inconsistent statements and a predicate must be laid before introduction of extrinsic evidence of the prior inconsistent statement. But those procedures do not mean that an attorney can only cross-examine a witness on a prior statement if the prior statement was made in response to the same exact question.

The trial court's instruction to the jury that the defense witnesses had not been impeached was a comment on the weight of the evidence. No objection was made at the time, but the comments were incurable and thus no objection was necessary to preserve them.

The trial court's exclusion of the judgments nisi as irrelevant was erroneous. The judgments nisi proved that the plaintiff was personally sued by the county for

16

bond forfeitures, even though he had been promised that there was a surety covering the forfeitures.

The trial court sustained an objection to cross-examination of the defendant on his understanding of partnership property law. The objection was that the question called for a legal conclusion. In fact, there is no limitation on the use of law during cross-examination (so long as the law is correct), except that witnesses must provide the factual basis for any conclusion they draw under the law.

The trial court overruled an objection to Harold Stein testifying that he is unaware of Barry Lovely ever doing anything underhanded in business. That is improper character evidence.

These errors were harmful and reversible individually. Their combined effect was to probably cause the rendition of an improper judgment.

**ARGUMENT**

## I.     Improper Impeachment

### A.     *Introduction*

During the plaintiff's examinations of Harold Stein, Barry Lovely, and Thomas Snoddy, the trial court continuously interrupted to admonish the plaintiff's attorney for "improper impeachment." 4 RR 109-110. The trial court would make statements such as, "How many times am I going to have to tell you, if you ask the proper question and he doesn't answer it truthfully or he answers it differently than he's asked before, that's impeachment." 4 RR 110-11. Initially, no objection was made by the Defendant's attorney: the court would sua sponte interrupt to admonish the plaintiff's attorney against impeachment. 3 RR 221. After several such interruptions, the Defendant's attorney began actively objecting. 3 RR 273; 4 RR12-13.

The first time the trial court interrupted, the plaintiff's attorney was questioning Harold Stein. 3 RR 221. Harold Stein had just announced that Gerald Todd was the surety for Fast Action Bail Bonds. 3 RR 221.

> Q:     Have you ever told anyone about this before today?
> A:     No one's ever asked me that question I don't believe.
> Q:     Okay. So this is basically a—a—I have never been directly asked whether Gerald Todd—okay.
> THE COURT:     I mean, that—wait. Wait. Wait. Mr. Wharton, if you're going to impeach the witness, that's not proper impeachment. If you've got something in a deposition that's impeachable material, that's

18

one thing, but that's improper.

MR. WHARTON: Yes, Your Honor.

Q: Okay. You've never—you never told me about this in a deposition, right?

A: No, sir, I'm not sure you ever asked me, Jonathan.

THE COURT: Are you saying you asked it, Mr. Wharton, because like I said that's not proper impeachment.

MR. WHARTON: I see what you're saying I guess, Your Honor.

Q: Okay. You—you told me in your deposition that you don't know the structure of the Fast Action Bail Bond Business in Upshur County, didn't you?

A: You know, I haven't read my deposition. I never got a chance to see that. I don't recall what I said to you.

Q: Okay. So if I asked you what's—

THE COURT: Let's do this the right way.

MR. WHARTON: Yes.

THE COURT: You got a page and a line. You identify that so Mr. Van Cleef can also find it. You bring it up here and let the witness read it and then you ask the question.

MR. WHARTON: Yes, ma'am.

THE COURT: Read it silently, the witness.

MR. WHARTON: And may I—

THE COURT: You can approach.

MR. WHARTON: May I start by asking the question though, the underlying question—

THE COURT: Sure. I think you did but if you didn't, go ahead.

MR. WHARTON: Okay. So do you know the structure of the Fast Action Bail Bond business in Upshur County?

THE COURT: Okay. Don't answer. I mean, I think you need to bring that up.

MR. WHARTON: Okay. I'll bring it up. You've already—you've already said no to that or you already said yes, it's Gerald Todd or whatever.

THE COURT: Mr. Wharton, I don't think that's what he said.

3 RR 221-23.

The improper impeachment issues continued in the plaintiff attorney's re-direct examination of Harold Stein. On direct, Mr. Stein said that he was a bail bond broker, meaning that he refers clients that need a bond to a bondsman. 3 RR 216. He advertises telephone numbers, and when the calls come in, he refers the callers to a bondsman for a fee. 3 RR 216. In Mr. Snoddy's cross-examination, he stated that he actually does another kind of brokerage: "we get sureties to be surety." 3 RR 236-38. He testified that he connects young bondsmen with sureties that will provide them with advice and financial assistance. 3 RR 238-39. This testimony was transforming Mr. Stein from his apparent position before trial, which was the man Mr. Snoddy claimed was the surety but who maintained that he had nothing to do with the business, into the person who had supplied Mr. Snoddy with a good and effective surety. Mr. Snoddy's attorney came up with an explanation for his failure to mention this new role in the business: "Mr. Wharton didn't ask you about the other kind of brokerage you do, did he?" 3 RR 236. As a result, the plaintiff's attorney began cross-examining Mr. Stein on his failure to mention the claims that were surfacing at trial:

> Q:    Okay. So you're saying that the Surety Company was the surety, quote, you call Surety Company, right?
> A:    Yes, sir.
> Q:    And I—and have you ever done—let's see here. And what did—what did the, quote, unquote, Surety Company do in relation to these businesses in East Texas? There are more than one, right?
> A:    They provided people to put up financial statements to write bail

bonds.

Q: Okay, so when I asked you in—

MR. WHARTON: Let me approach, Your Honor.

THE COURT: Is this his deposition?

MR. WHARTON: It is, Your Honor.

Q: And on page 14, line 23, I began, I say: The name of the company was Surety Company and your answer was yeah, yeah, it was just a company that had set up, Mr. Smith was involved and he had all throughout East Texas and Thomas somehow, I'm not sure how Thomas took over for Mr. Smith, but he took over for them where they were individual bail bondsmen and we would supply—

THE COURT: Slow down. Slow down.

MR. WHARTON: I apologize, Your Honor.

Q: Where there were individual bondsmen and we would supply them clients or send them referral business and a Mr. Cathey—

MR. VAN CLEEF: Your Honor, this is not—I'm sorry, I don't want to miss an opportunity to object but because I don't know what we're doing. This is not a question.

THE COURT: I'm not sure.

MR. VAN CLEEF: Improper impeachment.

THE COURT: It's not proper impeachment. So if you—okay.

MR. VAN CLEEF: I object. This is improper impeachment.

THE COURT: I'll sustain to that if that's what you're trying to do and I'm not sure what it is that you're claiming is despair between the deposition and the testimony today but you need to clarify that and then you need to show the witness a deposition and let him read the questions and the answers and then you can go into what you were doing if that's where you're going.

Q: Did you tell me anything about this or surety brokerage stuff at the deposition?

A: I don't recall if you asked me.

Q: When I asked you about the Surety Company, did you tell me? Did you—did you—what did you—when you—what you told me was this—was that you were—that you were bail bond broker and what Surety Company does is take the bail bond business and refer it to bondsmen. Didn't say anything—

A: That—that's one thing. Absolutely.

21

Q:     Nothing, nothing about all this brokerage referral stuff, nothing like that.

A:     You never did ask me that, Jonathan.

Q:     Okay. But when I asked you about Surety Company and what it does—

A:     I told you exactly what Surety Company did. What you asked me, I answered your question directly.

Q:     You just—I guess at that time didn't think it was important to mention any of this other stuff.

THE COURT REPORTER:     Slow down.

THE COURT:     Again, this is—why don't you let me see the deposition question because if you ask the witness that question that you're asking him now and he didn't answer it, that's proper impeachment. But if you just ask the question—

MR. WHARTON: I'll give you—

THE COURT:     —that calls for a specific answer which he answered, you cannot impeach him from that now. I'm, you know, in the dark here because I don't have a deposition.

MR. WHARTON: I can just, see, we can read the deposition at some point.

THE COURT:     Well, I don't think so not unless it's proper impeachment. Let me see the deposition and the question and I'll read it silently.

MR. VAN CLEEF:     I have a copy. The Court can just hold onto this.

THE COURT:     Just tell me, Mr. Wharton, just tell me what page and what line and I'll read the question.

MR. WHARTON: Okay.

THE COURT:     I've got it. I've got it.

MR. WHARTON: Okay. From 14 to 15, page 14 and 15.

THE COURT:     The whole, the whole pages.

MR. WHARTON: Yes.

THE COURT:     Okay. Mr. Wharton, which question is it you want me to focus on that you asked specifically where it would be what are all the duties or whatever all do you do and you don't have to—I've got it so you can tell me what line.

MR. WHARTON: Your Honor, in response—

22

THE COURT: Not in the response, I'm talking about what question was it that you asked him because that's what's important is the question that you asked him. So what question is it?

MR. WHARTON: It was a preceding a narrative, Your Honor. So it wasn't—it wasn't in response to a direct question. He's talking about what the business does, what they do in relation—we're asking about Fast Action Bail Bonds and the Surety Company and what they do and his response doesn't indicate anything about this referral.

THE COURT: Again, I'm going to ask you one more time: What question, what is the question on line what that you asked him?

MR. WHARTON: It's not a question, it's in the answer.

THE COURT: Okay. Well, that's not a proper impeachment.

3 RR 272-76.

These interruptions and rulings were not purely procedural: the impact on the jury was clearly understood by the parties at the time. The Defendant's attorney specifically asked the court "to let the jury know that that was not an impeachment," and the court obliged. 4 RR 14 at 15-21. That request was made again later in the trial. 4 RR 25 at 21-25. The court would regularly instruct the jury that the plaintiff's attorney's cross-examination was "not impeachment." 4 RR 128 at 23-25.

During one objection, the Defendant's attorney was allowed to interrupt the plaintiff's cross-examination to "voir dire" the witness under the rule of optional completeness because of the plaintiff's attorney's "improper impeachment." 4 RR 22-29. The plaintiff's attorney was cross-examining the Defendant on the issue of Barry Lovely's impersonation of Michael Anderson. 4 RR 21. The Defendant had testified

23

in his deposition that "Mr. Anderson has been having people call his phone number trying to get him to say that he's Michael Anderson or basically trying to set the guy up." 4 RR 29 at 7-17. At trial, Mr. Snoddy denied claiming that the phone calls asking for Mr. Anderson were a set-up. 4 RR 21-22. When the plaintiff's attorney began to read the deposition to Mr. Snoddy, the defense attorney objected to impeaching him: "Once again that was an impeachment procedure and there was no impeachment." 4 RR 22 at 21-22. The trial court agreed, and the defense attorney was then told that *he* can read the deposition testimony if he would like "under the rule of optional completeness since it was not read." 4 RR 26 at 1-6. The defense attorney was then allowed, during the plaintiff's attorney's cross-examination, to read the deposition testimony, word for word, out loud to the jury. 4 RR 29. That was the very same deposition testimony that the court would not allow the plaintiff's attorney to use. 4 RR 22-26.

In another instance, Barry Lovely testified that Mr. Snoddy would call him when transferring the phone lines to him. 4 RR 129-30. In his deposition, he said that he did not know when the phone numbers were transferred to him. 4 RR 132-33. The trial court refused to allow the questioning because "It's got to be the same question." 4 RR 133.

The trial court would also interrupt to "clarify" points for the defense

witnesses. One defense theory was that Mr. Snoddy owned the phone lines, not Mr. Anderson, and he would not have given valuable phone lines to someone for no money. 3 RR 26-27. Yet Mr. Lovely testified that he was transferred the phone lines without paying Mr. Snoddy anything. 4 RR 133-34. Immediately following one of the trial court's instructions that "it's got to be the same question," this colloquy took place:

> Q:      So you say that you didn't pay Mr. Snoddy for transferring the phone line to you.
> A:      You didn't ask me that question awhile ago.
> Q:      I'm asking you, this is the question.
> A:      Occasionally. I mean, he have a phone, he have a phone number. Occasionally. That's his phone number. He transferred the number to me occasionally, the bill have to be paid.
> Q:      Okay. I'm not asking about the bills, I'm saying you didn't pay him to transfer the number to you, that's what you're—that's what you're—that's what you're saying, right, you didn't pay him?
> A:      I thought you just asked me, I said I didn't pay him for the phone bill, for the phone number.
> Q:      I'm not asking about the bill, sir.
> A:      I'm not understanding, sir.
> Q:      I'm asking did you pay him to transfer the phone line to you.
> THE COURT:      What do you mean by transfer?
> MR. WHARTON:      I—when it's diverted from—
> THE COURT:      Like a—
> MR. WHARTON:      From a—
> THE COURT:      Kind of like a call forwarding, is that what you mean?
> MR. WHARTON:      Maybe. I mean...
> THE COURT:      Well, I think—the reason I say that is because there's been a lot of different words passed around from both—both parties and there's two different things that can be happening as I see it

25

and I'm not—I don't know what the witnesses understand, but I think if you-all would clarify what your question is it might make it easier on the witnesses and I'm not sure what the question is, if it's a forwarded call or talking about the transferring the account, giving the phone number to someone, like transferring the ownership of that phone number versus transferring—that's what I'm asking so just clarify your question, what it is your asking.

MR. WHARTON: Yes, ma'am.

4 RR 134-135. After several pages of questioning about the nature of the transfer to clarify the point for the court, the plaintiff's attorney returned to the issue of payment for the transfer of the phone line:

> Q: And you're saying you've—you pay the phone bill when it's transferred to you.
> A: I don't think I said that.
> Q: Okay. Are you saying that?
> A: When he transfer the number to me I think I said the phone bill has to be paid and I never did say I pay the phone bill.
> Q: Okay. Do you pay the phone bill?
> A: I don't know if I do or I don't. I know—I don't know if I do or I don't. He never have gave me a bill and say, hey, pay the bill.
> Q: Okay. So who knows, maybe you pay the bill, maybe you don't, is that, okay, is that what you're saying?
> A: I know the phone bill is still active so I know somebody pays it.
> A: Okay.
> MR. VAN CLEEF: Object to the sidebars, Your Honor.
> THE COURT: I'll overrule it.
> Q: So you're not paying Snoddy, Mr. Snoddy for the phone, you're not paying—you didn't pay him to transfer—to forward the phone to you is what—right?
> A: I think that's what I said awhile ago, sir.

4 RR 137-38.

There were additional interruptions, admonitions and instructions during the cross-examination of Barry Lovely:

Q:      All right. Mr. Lovely, according to you, you don't know why Mr. Snoddy transferred you the phone number.
A:      I don't know why he transferred me the phone numbers?
Q:      That's my question.
A:      The number was transferred because I was doing bonds.
Q:      All right. So you're doing bonds, but you don't know why. I mean, the—lot of people doing bonds, right, sir?
A:      I assume.
Q:      And so but you don't know why he transferred those phone lines to you, right?
A:      I think I just answered your question when I said I was doing bonds.
Q:      Did he ever—let me—let me ask it this way: Did he ever explain why he transferred the phone number to you?
A:      To do bonds.
Q:      Okay. So you remember the deposition we did, it was on August 20th of 2013, right?
        MR. VAN CLEEF:        I need a page and line, please.
        MR. WHARTON: Okay.
Q:      It was page—page 15, line 2. I'm going to go through this. My understanding, I'm going to do this so, okay. So you understand—you remember the—that the date, August 20th, 2013?
A:      I don't remember the date. I know I was in your office for a deposition, I don't remember the date it was on.
Q:      Okay. Can you—do you see the date on this?
A:      Yes, uh-huh.
Q:      Okay. What does that say?
A:      It says August the 20th, 2013.
Q:      Okay. And I was there, right?
A:      Yes.
Q:      Okay. We asked you a bunch of questions.
A:      Yes.
Q:      Okay. And I'm going to show you line 2, page 15.

27

A: Okay, I see what you're saying.

Q: Okay. Do you change your answer?[2]

THE COURT: What's the question?

MR. WHARTON: The question was: Did he ever—did Mr. Snoddy ever explain why he transferred the phone line to you?

THE COURT: Okay. And the answer on the deposition was?

MR. WHARTON: Okay. So I'm allowed—I can read it?

THE COURT: Yes. Yes, you can do that but you just have to do the things leading up to it which you've done so you can do that.

Q: Okay. Okay. Did he ever explain why he transferred that number to you. And the answer was: I never did say we had a conversation about it. We transferred it. I said it's his number. He has the right to transfer it if he don't want to transfer it.

MR. VAN CLEEF: Your Honor, that is not the question that Mr. Wharton asked this witness. This is improper impeachment. He asked the witness if you ever have a conversation with him. He said no. That's not what this—this doesn't say yes.

THE COURT: I'll agree. It doesn't so—

MR. VAN CLEEF: I would ask the jury—

THE COURT: And—okay. The jury will be instructed that that's not impeachment, but just go ahead, just move along, Mr. Wharton.

MR. WHARTON: Yes, ma'am.

THE COURT: Getting bogged down.

4 RR126-29.

Eventually it became clear that the trial court would not allow inquiry into inconsistent statements unless the questions preceding the statements were identical. The court would instruct the plaintiff's attorney that he had to announce the page and line to opposing counsel, show the witness the deposition, allow him to read it, and then read it out loud. 4 RR 222. But when the plaintiff's attorney would begin to ask

[2]The trial court had previously instructed the plaintiff's attorney to let the witness read the deposition testimony before reading it out loud. 3 RR 324 at 1-5.

28

a question, the court would interrupt to say "Okay. Don't answer. I mean, I think you need to bring that up." 4 RR 223. The court would refuse to read the witness's answer when determining whether the line of questioning was proper: her concern was only with whether the questions asked in the deposition and at trial were identical. 3 RR 275-76. At one point, the plaintiff's attorney began asking the court how impeachment was supposed to proceed:

> MR. VAN CLEEF: Judge, I have to object. When he walks up and acts like he's going to—he's got my client under oath and different things and it's got to stop.
> THE COURT: I'm going—
> MR. WHARTON: How am I going to—
> MR. VAN CLEEF: May I finish? He's telling him to read like four questions or three questions or two questions. He is not asking the same question and coming up and showing it to him and then asking him about that question. He's asking—
> THE COURT: I know.
> MR. VAN CLEEF: —two or three and I can't have that.
> MR. WHARTON: Your Honor, how—if he says—he says I didn't use the word child games and he used the word child games how am I'm supposed to do that? I just—I'm trying—
> THE COURT: As long—
> MR. WHARTON: —to follow your rules.
> MR. VAN CLEEF: It's a bad question.
> THE COURT: As long as it's in the same context it's not a problem.
> MR. WHARTON: So how do I introduce it? How do I—how do I—I'm trying to follow your ruling.
> THE COURT: Let me see it.
> MR. WHARTON: Five to fourteen, I believe 14 he says child's games. He specifically says Anderson trying to set him up and he specifically calls it child games.
> THE COURT: I'm sorry, did you tell me the wrong page? Did I just

29

miss it?

MR. WHARTON: I believe.

THE COURT:      Started here?

MR. WHARTON: I believe so. Mr. Anderson has been having people call trying to set him up. That's what he said and then he said he called it child's games. Those are specific—

THE COURT:      I'm looking for that.

MR. WHARTON: I believe it's 14, 14 says child games. I don't—I don't know—

THE COURT:      Well, okay, this is—

MR. VAN CLEEF:      It's not the same question.

THE COURT:      Thing is, my understanding of the original question was that he made these comments in reference to Mr. Lovely and Mr. Anderson, and Mr. Anderson basically calling it child games or he calling Mr. Anderson's conduct or something child games or setup, but this is a different context that he's talking about. He's talking about getting phone calls himself and, you know, I mean, bottom line is if you've got something that is—that is distinct contrast in the question that you're asking, but your question's got to be right and it's got to be on point. If it's a little, you know, if it's a little contextual difference then it's not impeachment.

4 RR 22-25.

Barry Lovely testified that Mr. Snoddy called him when transferring the phone lines to him. 4 RR 130. In Mr. Lovely's deposition, he said that "he doesn't know when it's transferred." 4 RR 133. Cross-examination on the inconsistency was not allowed because the questions were not the exact same. 4 RR 133. The plaintiff's attorney would maintain to the court that the questions do not have to be identical, but to no avail:

MR. VAN CLEEF:      It's got to be the same question.

30

THE COURT:     It's okay. It's got to be the same question.
MR. WHARTON: I can't—it doesn't have to always be the exact same question.
THE COURT.     Well, I'm going—I'm going to sustain your objection. That's not proper impeachment.

4 RR 133. After the court's ruling, Barry Lovely became so bold as to announce, "That's what I was saying all along from the deposition. I've been saying it all along." 4 RR 133.

### B.     Law

"The rule of admissibility of evidence of prior inconsistent statements should be liberally construed and the trial judge should have discretion to receive any evidence which gives promise of exposing a falsehood." Aranda v. State, 736 S.W.2d 702 (Tex. Crim. App. 1987). "The [prior inconsistent statement] rule is not as complicated as it looks." Ferguson v. State, 97 S.W.3d 293, 296 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). "When examining a witness about the witness's prior inconsistent statement—whether oral or written—a party must first tell the witness: (A) the contents of the statement; (B) the time and place of the statement; and (C) the person to whom the witness made the statement." Tex. R. Evid. 613(a). "If the witness's prior inconsistent statement is written, a party need not show it to the witness before inquiring about it, but must, upon request, show it to opposing counsel." Tex. R. Evid. 613(b). "A witness must be given the opportunity to explain

31

or deny the prior inconsistent statement." Tex. R. Evid. 613(c). Finally, "Extrinsic evidence of a witness's prior inconsistent statement is not admissible unless the witness is first examined about the statement and fails to unequivocally admit making the statement." Tex. R. Evid. 613(d).

The rule has two concerns: first, it sets up procedures that must be followed when examining the witness on a prior inconsistent statement (giving the witness an opportunity to review and explain the statement); and second, it creates a predicate that must be laid before extrinsic evidence of the statement is admitted. Ferguson v. State, 97 S.W.3d 293, 296 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). In this case, no extrinsic evidence was ever offered, as the witnesses universally admitted to making the prior statements.

The rule contains a limitation on the admissibility of impeachment evidence, not a limitation on the scope of cross-examination. *See* Ferguson v. State, 97 S.W.3d 293, 297 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). The scope of cross-examination is relevance. Tex. R. Evid. 611(c) ("A witness may be cross-examined on any relevant matter, including credibility."). In Ferguson, the witness admitted to making an inconsistent statement, but the cross-examiner moved to introduce extrinsic evidence of the statement anyway. *Id.* at 295-97. The trial court sustained the objection to the extrinsic evidence, but also ordered counsel not to "go into" the

contents of the statement. *Id.* at 295. That was erroneous: counsel should have had the liberty to cross-examine the witness on the contents of the statement. *Id.* at 297.

In fact, the rule that properly limits the use of out-of-court statements is the hearsay rule. Traditionally, introduction of prior consistent statements was referred to as "bolstering." Thomas v. State, 811 S.W.2d 201, 208 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd). The prior consistent statement was offered to prove that the in-court testimony was more likely credible because it had been unwavering. Courts disallowed the bolstering as hearsay. *Id.* Under the common law, prior inconsistent statements were only admissible for impeachment purposes. Tex. R. Evid. 801(d); *see* Del Carmen Hernandez v. State, 273 S.W.3d 685, 688-89 (Tex. Crim. App. 2008).

> The theory of attack by prior inconsistent statements is not based on the assumption that the present testimony is false and the former statement true but rather upon the notion that talking one way on the stand and another way previously is blowing hot and cold, and raises a doubt as to the truthfulness of both statements.

Del Carmen Hernandez, 273 S.W.3d at 689 (quotations omitted).

The rules have changed, though. *Id.* (applying the at-the-time new Tex. R. Crim. Evid. 801(e)(1)(C)). If a hearsay objection is made, counsel must explain his theory for admissibility, be it that the statement is not offered for the truth of the matter asserted but rather for impeachment purposes only (which could be accompanied by a limiting instruction), it is a prior inconsistent statement under oath

per Rule 801(e)(1)(A)(i), it is an admission of a party-opponent per Rule 801(e)(2) (in the case of Mr. Snoddy's statements), it is a statement made in a deposition in the same proceeding per Rule 801(e)(3) (in the case of every question about the deposition statements), or one of the other multitude of exceptions to the hearsay rule. Counsel could also lodge an objection based on relevance or unfair prejudice or another established rule of evidence. Tex. R. Evid. 401 & 403. There was not even a hearsay objection made to the plaintiff's cross-examination, presumably because defendant's counsel knew that every one of the statements inquired into would fit an exception to the hearsay rule.

Other than hearsay limiting unsworn statements by a witness (that is not a party-opponent) outside of a deposition, there is no rule that cross-examination is limited to inconsistent statements. *See* Ferguson v. State, 97 S.W.3d 293, 297 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) ("But it was error if the trial court prevented any further questions about any part of the statement. . . . The trial court had discretion to prevent impeachment with every sentence in the nine-page statement, but not to limit cross-examination to the whole document rather than portions of it."). That rule would be a significant change in trial procedure: every time a witness is asked about a statement he has made, counsel could object that the statement is not inconsistent. It is difficult to fathom what the purpose of such a rule

34

could be, given that the common-law prohibition against bolstering has been abrogated, at least as far as deposition testimony is concerned. Tex. R. Evid. 801(e)(3). In this trial, it served primarily as a source of interruption and distraction. If the statements are truly consistent, then there is no "impeachment," improper or otherwise: the cross-examination would have effected a bolstering of the witness's testimony. The rule applied by the trial court would limit the use of prior inconsistent statements to only the most effective cross-examinations. The procedures set up in Rule 613 do not do that: they only give the witness an opportunity to review and explain the prior statement.

Even if the rule did limit cross-examination to inconsistent statements, the cross-examinations detailed above would be proper. They highlighted flatly inconsistent statements (e.g., Barry Lovely testified that Mr. Snoddy would call him when transferring the phone lines to him (4 RR 129-30) but had previously testified that he did not know when the phone numbers were transferred to him (4 RR 132-33)), failures in memory (e.g., Thomas Snoddy stated "I don't know if I called the situation with Barry child games or a setup" (4 RR 21) when he did in those very terms (4 RR 29)), and statements that had to be either misleading or untrue (e.g., when asked what his company does, Harold Stein testified at trial that it provides sureties for bondsmen versus in his deposition, when he answered the same question

35

by saying that the company refers clients to bondsmen (3 RR 272-76)). The questions were not improper, and no objection was ever made based on hearsay or any other rule of evidence except "improper impeachment."

## II.    Comment on the Weight of the Evidence

### A.    Introduction

The trial court repeatedly instructed the jury that the plaintiff's cross-examinations were not proper impeachment. 4 RR 14 at 15-21; 4 RR 25 at 21-25; 4 RR 128 at 23-25. These instructions were themselves judicial comments on the weight of the evidence. No objection was made, but the comments were incurable and thus the issue has not been waived.

### B.    Law

"The general rule is that a presiding judge at a trial must conduct it in a fair and impartial manner and refrain from making unnecessary comments or remarks during the course of trial which may tend to result in prejudice to a litigant, or is calculated to influence the minds of the jury." Brown v. Russell, 703 S.W.2d 843, 847 (Tex. App.—Ft. Worth 1986, no writ). The court " should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Tex. R. Evid.

611(a). But the judge should not "convey his or her opinion of the case to the jury and ultimately influence the jury's decision." Moreno v. State, 900 S.W.2d 357, 359 (Tex. App.—Texarkana 1995, no pet.).

If no objection is made to the comment, incurable harm must be shown. State v. Wilemon, 393 S.W.2d 816, 818 (Tex. 1965). An example of an improper but not incurable comment on the weight of the evidence is as follows:

> Q.     Would you tell the jury what you think a partnership is?
> MR. PETERSEN:  Objection to that, Your Honor. That is a matter of law. The Court will instruct the jury what the law is and not what this man thinks.
> MR. HAYNSWORTH:    Your Honor, the Plaintiff has alleged that Mr. Quintero was engaged in a partnership agreement with Mr. Guzman. Now, if they know what a partnership is, I would like to know if Mr. Quintero was in such a relation.
> MR. PETERSEN:  Your Honor, we pled that by his acts and his conduct he was a partner. There is no declared partnership. We will agree to that, but by his acts and conduct, he was a partner in this operation.
> THE COURT:     Overrule the objection. *This man knows what a corporation is, and a sole proprietorship, and he knows what a partnership is and that is how he has been operating.* I am going to let him answer the question. He has testified to all three factors since he has been on the stand.

Quintero v. Citizens and S. Factors, Inc., 596 S.W.2d 277, 281-82 (Tex. Civ. App.—Houston [1st Dist.] 1980, no writ) (emphasis in original). The court held that the comment standing alone was "clearly improper," but in context it was a statement of the witness's qualification to testify on whether a partnership existed. *Id.* at 282.

37

With a timely objection, the court could have clarified the purpose of his comment or given an instruction to the jury to disregard it. *Id.*

In contrast, the trial court in this case specifically and repeatedly instructed the jury that the plaintiff's cross-examination was not impeachment. The only possible use of that instruction was to inform the jurors that the witness's credibility had not been meaningfully punctured. It was intended as a direct influence on the jury's analysis of credibility. There was no other purpose to the instruction. It would have been absurd and pointless for the plaintiff's attorney to request an instruction from the court that its immediately preceding instruction should itself be disregarded: even if the court had a sudden change of heart and issued the new instruction, the harm would not have been cured.

The harm to the plaintiff was compounded by the fact that the trial court was repeatedly and on its own motion interrupting the plaintiff's cross-examinations. The effect was to make it appear that the cross-examinations were highly improper and the plaintiff's attorney was out of line in impugning the witnesses' credibility. The trial court would not just sustain objections but "clarify" what witnesses were saying (e.g., at 4 RR 25 when the trial court said in the presence of the jury that the context of the two inconsistent statements was different) and would then say "that's not impeachment." 4 RR 129; 4 RR 133; 3 RR 276.

38

This case came down to a contest of credibility. Gary Roberts and Michael Anderson claimed that Thomas Snoddy offered them a partnership. 3 RR 30-31 & 38. Thomas Snoddy said they were lying. 3 RR 291-92. Norman Chism claimed Barry Lovely impersonated Michael Anderson. 3 RR 204-206. Barry Lovely denied it. 4 RR 151-52. Michael Anderson was paying forfeitures out of the business profits, but Thomas Snoddy and Harold Stein said that the business did in fact have a surety, even if they had no proof of payment. 3 RR 272-76. The jury resolved every one of these conflicts against the plaintiff after the court repeatedly and directly informed the jury that the defense witnesses were "improperly impeached."

## III. Exclusion of Judgments Nisi

### A. *Introduction*

The trial court excluded three exhibits, offered as Exhibits 26, 27 and 28, for relevance. These exhibits were judgments nisi by the county against Michael Anderson for bond forfeitures totaling $12,000. The trial court erred by excluding them as irrelevant.

### B. *Law*

The rule is as follows: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Tex. R. Evid. 401. "Evidence need not

39

by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence." Stewart v. State, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004). It does not have to be conclusive. *See id.* For example, when trying to prove that two criminal defendants (Le and Hoang) were involved in a murder committed by the appellant, the State was able to use recanted statements from them that the appellant told them that he was involved in a shooting.

> The statements, even if recanted, indicate that Le and Hoang had knowledge that a freeway shooting had occurred. The statements also show Le's and Hoang's willingness to implicate appellant in order to exonerate themselves. Evidence that shows Le's and Hoang's knowledge of the shooting and their willingness to implicate appellant is relevant because it makes the State's theory that all three men were involved more probable than the theory would be without the evidence.

Ho v. State, 171 S.W.3d 295, 305 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). In a wrongful death case in which the plaintiffs were claiming lost wages, the deceased's status as an illegal immigrant was relevant to a determination of his lost wages: it would have some effect on the wages he could expect to earn over his lifetime. Republic Waste Services, Ltd. v. Martinez, 335 S.W.3d 401, 406 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

### C. Application

Harold Stein testified that after a forfeiture, the name on the judgment nisi

40

determines who is liable. 3 RR 264-65 & 268-69. If Michael Anderson were named personally, not as an agent, but as the principal, he would have to satisfy the judgment. The trial court itself acknowledged the importance of the issue by berating the plaintiff's attorney for not offering proof that forfeitures resulted in Michael Anderson being sued.

> THE COURT: And even if [the sureties] weren't paid, nothing happened. So if it was a breach, if they didn't pay, if Mr. Snoddy didn't pay them and it was a breach how is it material?
> MR. WHARTON: Well, they had judgments against them.
> THE COURT: Well, we don't have any evidence of that now, do we?
> MR. WHARTON: Through testimony.
> THE COURT: We don't have any evidence, about any time period about any judgment.
> MR. VAN CLEEF: Or any amount.
> THE COURT: Or any amount. We don't.
> MR. WHARTON: Then I can introduce it.
> THE COURT: Well, good luck with that because I don't think you've got any in your materials over there and probably haven't disclosed them to this side.
> MR. VAN CLEEF: No.

4 RR 197-98.

The plaintiff subsequently offered three judgments nisi exhibits to prove that in fact Mr. Anderson was personally named when the business had a bond forfeiture. 5 RR 5-7. Yet when the exhibits were offered, the trial court sustained an objection to relevance. 5 RR 7-9 & 11-12. No objection or argument was made that the exhibits

41

should be excluded under another rule, such as for being unduly prejudicial or undisclosed in discovery.

The defense attorney argued that a judgment nisi is not a judgment: it "is what starts the case not ends the case and there's no indication on there basically any money was paid." 5 RR 7 at 21-25. That is close to true:

> A judgment nisi, commonly used in bond forfeiture proceedings, is a provisional judgment entered when an accused fails to appear for trial. A judgment nisi triggers the issuance of a capias and it serves as notice of the institution of a bond forfeiture proceeding. It is not final or absolute, but may become final. Nisi means "unless," so a judgment nisi is valid unless a party takes action causing it to be withdrawn.

Williams v. State, 332 S.W.3d 694, 696 n.2 (Tex. App.—Amarillo 2011, pet. denied). It operates similarly to a trial court's award of attorneys' fees for an appeal that has not yet happened: the award is conditioned on the defendant appealing and losing that appeal. *See* In re Ford Motor Co., 988 S.W.2d 714, 721 (Tex. 1998); Sw. Bell Tel. Co. v. Vollmer, 805 S.W.2d 825, 834 (Tex.App.—Corpus Christi 1991, writ denied).

That does not make the judgments nisi irrelevant. They indicated that when bonds were forfeited, Mr. Anderson was personally named in suits by the State. He was liable on those bonds, not Thomas Snoddy or Harold Stein or Gerald Todd or any other surety. The judgments nisi did not conclusively prove the amount that Mr. Anderson lost due to bond forfeitures by themselves, since they could be undone if

the criminal defendant showed good cause for his non-appearance at a later hearing. They proved that there was no surety standing behind Fast Action Bail Bonds except Michael Anderson himself, even though Mr. Anderson had paid Mr. Snoddy approximately$76,000 over the course of their two-and-a-half-year business relationship. 5 RR 164. That was the ultimate issue in the breach of contract and fraud causes, and it was decided without the aid of critical evidence.

## IV. Cross-Examination Based on the Law

The trial court refused to allow cross-examination by the plaintiff's attorney of Thomas Snoddy on the issue of ownership of partnership property after termination. 3 RR 298-99. The defendant objected that the questions called for a legal conclusion. 3 RR 298-99. Later, the trial court also sustained an objection on questions related to the law governing whether a partnership had been created. 3 RR 305-06.

"An improper legal conclusion is one that does not provide underlying facts to support the conclusion." Cooper v. Circle Ten Council Boy Scouts of Am., 254 S.W.3d 689, 698 (Tex. App.— Dallas 2008, no pet.). For example, the statement "I acted properly . . . and have not violated the [DTPA] . . . [and] did not breach my contract" is an improper legal conclusion and is therefore incompetent evidence. Anderson v. Snider, 808 S.W.2d 54, 54-55 (Tex. 1991). In contrast, if the facts

underlying the conclusion are included, the witness may testify to the legal conclusion. <u>Cooper</u>, 254 S.W.3d at 699-700.

The questions here did not call for unsupported legal conclusions. Rather, they asked for Mr. Snoddy's understanding of the law, particularly on the ownership of property that had been transferred to a partnership. 3 RR 298. That questioning was important because Mr. Snoddy was being accused of tortiously interfering with Mr. Anderson's business by disconnecting the phone lines and transferring them to himself and Mr. Lovely. CR 33-34. The characterization of the telephone numbers as partnership property was one of the ultimate issues for the jury, as if the property was owned by Mr. Snoddy, as he claimed, he would not be liable for transferring the number. If the telephone number was owned by the partnership, he would not have that right. Mr. Snoddy's belief and understanding as to ownership would also affect the determination of his mental state: that is, if he mistakenly believed that he still owned the telephone line, despite contributing it to the partnership, that would tend to prove that his interference was not tortious.

## V. Character Bolstering

The defendant used impermissible character evidence to bolster Barry Lovely's testimony that he did not impersonate Michael Anderson. Harold Stein was asked, "Is it your impression that Mr. Lovely has—does underhanded business practices?" 3 RR

258 at 24-25. The plaintiff objected and it was overruled. 3 RR 259 at 1-3. Mr. Stein answered "I don't know of any underhanded." 3 RR 259 at 10.

Character evidence is generally prohibited. Tex. R. Evid. 404(a). That is the rule for good character as well as bad. Smith v. State, 919 S.W.2d 96, 102 (Tex. Crim. App.1996) (en banc). One of the exceptions in criminal cases, listed under Tex. R. Evid. 404(a)(2), is that the accused may offer evidence of his pertinent trait. Thomas v. State, 669 S.W.2d 420, 423 (Tex. App.—Houston [14th Dist.] 1984, pet. ref'd). Similarly, in civil cases, a party accused of conduct involving moral turpitude may offer evidence of the party's pertinent trait. Tex. R. Evid. 404(a)(2)(B).

Even if Barry Lovely were a "party" (despite not being named as a defendant in the lawsuit), evidence of the party's pertinent trait must be offered in a specific manner. That is, "When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion." Tex. R. Evid. 405(a)(1). It is only on cross-examination that specific instances of conduct may be inquired into. Tex. R. Evid. 405(a)(1). Harold Stein's testimony was not on reputation or opinion: it was testimony that Barry Lovely does not engage in bad conduct. That is impermissible. Since credibility was a major issue in the case, evidence that improperly bolstered the defense witnesses' did serious harm to the plaintiff's case.

45

## VI.    Cumulative Error

The combined effect of the errors throughout the trial probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a). Although the errors in this case are reversible alone (particularly the "improper impeachment" problems and the exclusion of the judgments nisi), "When several errors exist but are not considered reversible, all errors considered together could present cumulative error requiring reversal." Fibreboard Corp. v. Pool, 813 S.W.2d 658, 695-98 (Tex. App.—Texarkana 1991, writ denied).

In a case hinging almost entirely on credibility, the trial court improperly limited cross-examination of the defense witnesses and instructed the jury that the defense witnesses had not been impeached.  One defense witness was allowed to bolster the character of another. Evidence demonstrating that the supposed surety was not the one sued for forfeitures was excluded. Inquiry was not allowed into the defendant's understanding of the law on partnership property. Even if these errors were not reversible alone, together they created a substantial probability that the jury would not come to a proper verdict based on relevant and credible evidence.

### PRAYER

For the reasons stated above, Appellant respectfully requests that this court grant him a new trial.

Respectfully submitted,

SNOW E. BUSH, JR., P.C.
420 N. Center Street
Longview, TX 75601
Tel. (903) 753-7006
Fax. (903) 753-7278
E-mail: jonathanwharton1@sbcglobal.net


By: /s/ Jonathan Wharton
      JONATHAN WHARTON
      STATE BAR NO. 24075764
      ATTORNEY FOR APPELLANT,
      MICHAEL ANDERSON

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been delivered to L. Charles Van Cleef, counsel for appellee, on this the 26th day of May, 2015.

/s/ Jonathan Wharton

JONATHAN WHARTON


## CERTIFICATE OF COMPLIANCE

I hereby certify that the Appellants Brief (as measured under Tex. R. App. P. 9.4(i)(1)) contains 10,533 words as counted by Microsoft WordPerfect on this the 26th day of May, 2014.

/s/ Jonathan Wharton

JONATHAN WHARTON

47

_____

IN THE COURT OF APPEALS FOR THE SIXTH DISTRICT, TEXARKANA, TEXAS
_____

**MICHAEL ANDERSON**
*Appellant,*
**v.**
**THOMAS SNODDY**
*Appellee.*
_____

On Appeal from Cause No. 548-12
In the 115th Judicial District Court of Upshur County, Texas
Honorable Lauren Parish, Presiding Judge
_____

**APPENDIX TO APPELLANT'S BRIEF**
_____

Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 1

Jury Charge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 2

Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 3

# TAB 1



CAUSE NO. 548-12

MICHAEL ANDERSON

V.

THOMAS SNODDY

IN THE 115TH JUDICIAL

DISTRICT COURT

UPSHUR COUNTY, TEXAS

FILED
CAROLYN PARROTT
DISTRICT CLERK
2014 NOV 21 PM 3:16
UPSHUR COUNTY, TEXAS
BY _____ DEPUTY

## FINAL JUDGMENT

On the 13th of October, 2014, the Court called this case ready for trial. Plaintiff, Michael Anderson, appeared in person and through his attorney and announced ready for trial. Defendant, Thomas Snoddy, appeared in person and through his attorney, and announced ready for trial. The Court determined that it had jurisdiction over the subject matter and the parties. It then impaneled and swore the jury. From October 21, 2014 to October 23, 2014, the jury heard the evidence and arguments of counsel. The Court submitted questions, definitions, and instructions to the jury. In response, the jury made findings that the Court received, filed, and entered of record, and the Court takes judicial notice of the question submitted to the jury and the jury's answers to the same.

The Court, having reviewed the jury's answers to the questions submitted to it by the Court, is of the opinion that judgment should be rendered in favor of the Defendant.

It is, therefore, ORDERED and ADJUDGED that the Plaintiff, Michael Anderson, take nothing from Defendant in this suit and that Defendant should recover his costs of Court from Plaintiff. The Court denies all relief not granted in this judgment.

CERTIFIED TRUE AND CORRECT COPY CERTIFICATE
THE STATE OF TEXAS
COUNTY OF UPSHUR
The above and forgoing is a full, true and correct photographic copy of the original on file and on record in my office.
Containing _____ pages.
Attest November 2, 2014 AD
Carolyn Parrott, District Clerk
Upshur County, Texas
By _____ Deputy

1

Signed on this __21__ day of __November__, 2014.

_____
PRESIDING JUDGE



# TAB 2

| MICHAEL ANDERSON | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | UPSHUR COUNTY, TEXAS |
| | § | |
| THOMAS SNODDY | § | 115TH JUDICIAL DISTRICT |

## CHARGE OF THE COURT

**LADIES AND GENTLEMEN OF THE JURY:**

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions.

1. Do not let bias, prejudice, or sympathy play any part in your decision.

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow

65

all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. Unless otherwise instructed, the answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

QUESTION 1

Did Michael Anderson and Thomas Snoddy agree to enter a partnership agreement in Upshur County?

A partnership is an association of two or more persons to carry on a business for profit as owners.

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

Factors indicating that persons have created a partnership include the persons':

1.      receipt or right to receive a share of profits of the business;

2.      expression of an intent to be partners in the business;

3.      participation or right to participate in control of the business;

4.      agreement to share or sharing:

        A.      losses of the business; or

        B.      liability for claims by third parties against the business; and

5.      agreement to contribute or contributing money or property to the business.

An agreement by the owners of a business to share losses is not necessary to create a partnership

Answer "Yes" or "No."

Answer: ___No___

67

Only answer Question 2 if you answered "Yes" to Question 1.

QUESTION 2

Did Thomas Snoddy fail to comply with the partnership agreement?

A failure to comply, if any, must be material. The circumstances to consider in determining whether a failure to comply is material are:

1. The extent to which the injured party will be deprived of the benefit which he reasonably expected.

2. The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived.

3. The extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing.

Answer "Yes" or "No."

Answer: _____

68

Only answer Question 3 if you answered "Yes" to Question 1.

QUESTION 3

Did Thomas Snoddy ~~comply~~ *fail to* comply with his fiduciary duty to Michael Anderson?

Because a relationship of trust and confidence existed between them, Thomas Snoddy owed Michael Anderson a fiduciary duty. A partner's duty to furnish information requires him, on request and to the extent just and reasonable, to furnish complete and accurate information concerning the partnership to a partner.

Answer "Yes" or "No."

Answer: _____

69

You are instructed that in order to answer "Yes" to Question 4, your answer must be unanimous. You may answer "No" to Question 4 only upon a vote of 10 or more jurors.

QUESTION 4

Do you find by clear and convincing evidence that Thomas Snoddy committed fraud against Michael Anderson?

Fraud occurs when:

A.     a party makes a material misrepresentation, and

B.     · the misrepresentation is made with knowledge of its falsity, or made recklessly without any knowledge of the truth and as a positive assertion, and

C.     the misrepresentation is made with the intention that it should be acted on by the other party, and

D.     the other party relies on the misrepresentation and thereby suffers injury.

Fraud may also occur when:

A.     a party fails to disclose a material fact within the knowledge of that party, and

B.     the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discovery the truth, and

C.     the party intends to induce the other party to take some action by failing to disclose the fact, and

D.     the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Answer "Yes" or "No."

Answer: _____No_____

Only answer Question 5 if you answered "Yes" to one or more of the following Questions: Question 2, Question 3, or Question 4. If you answered "Yes" to one or more of those Questions, answer Question 5.

QUESTION 5

What was the amount of Thomas Snoddy's profit received from the Fast Action Bail Bonds business in Upshur County?

Answer in dollar and cents, if any.

Answer: _____

71

Only answer Question 6 if you answered "Yes" to one or more of the following Questions: Question 2, Question 3, or Question 4. If you answered "Yes" to one or more of those Questions, answer Question 6.

QUESTION 6

What sum of money, if any, if paid in cash, would fairly and reasonably compensate Michael Anderson for his damages, if any, that resulted from the conduct you found in response to Question 2, Question 3, or Question 4?

Consider the following elements of damages, if any, and none other.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any.

1.    Loss of the benefit of the bargain

The difference, if any, between the value of the services Thomas Snoddy promised and the services he provided.

Answer: $_____

72

Only answer Question 7 if you answered "Yes" to one or more of the following Questions: Question 2, Question 3, or Question 4. If you answered "Yes" to one or more of those Questions, answer Question 7.

QUESTION 7

What is a reasonable fee for the necessary services of Michael Anderson's attorney, stated in dollars and cents?

Answer separately in dollars and cents, if any.

1.    For representation in the trial court.

Answer: $_____

2.    For representation through appeal to the court of appeals.

Answer: $_____

3.    For representation at the petition for review stage in the Supreme Court of Texas.

Answer: $_____

4.    For representation at the merits briefing stage in the Supreme Court of Texas

Answer: $_____

5.    For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: $_____

QUESTION 8

Did Thomas Snoddy or Barry Lovely intentionally and tortiously interfere with Michael Anderson's existing and prospective bail bond contracts?

Interference is intentional if committed with the desire to interfere with the contract or with the belief that interference is substantially certain to result.

Interference is tortious if unlawful or otherwise wrongful, such as by fraud or theft.

Answer "Yes" or "No" for each person listed.

Answer:

Thomas Snoddy: __NO__

Barry Lovely: __NO__

74

Only answer Question 9 if you answered "Yes" as to Barry Lovely in response to Question 8.

QUESTION 9

Was Thomas Snoddy part of a conspiracy that damaged Michael Anderson?

To be part of a conspiracy, Thomas Snoddy and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to Michael Anderson. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

Answer "Yes" or "No."

Answer: _____

Only answer Question 10 if you answered "Yes" to Question 8 (for one or both individuals) or Question 9.

You are instructed that in order to answer "Yes" to Question 10, your answer must be unanimous. You may answer "No" to Question 10 only upon a vote of 10 or more jurors.

QUESTION 10

Do you find by clear and convincing evidence that the harm to Michael Anderson found in response to Question 8 resulted from malice?

"Malice" means a specific intent by Thomas Snoddy to cause substantial injury or harm to Michael Anderson.

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Answer "Yes" or "No."

Answer: _____

Only answer Question 11 if you answered "Yes" to Question 8 (for one or both individuals).

QUESTION 11

What sum of money, if any, if paid in cash, would fairly and reasonably compensate Michael Anderson for his damages, if any, that resulted from such conduct?

Consider the following elements of damages, if any, and none other.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1.      The loss of profits in Michael Anderson's bail bond business sustained in the past.

Answer: $_____

2.      The loss of profits in Michael Anderson's bail bond business that, in reasonable probability, will be sustained in the future.

Answer: $_____

77

**Presiding Juror:**

1.      When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2.      The presiding juror has these duties:

     a.      have the complete charge read aloud if it will be helpful to your deliberations;
     b.      preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;
     c.      give written questions or comments to the bailiff who will give them to the judge;
     d.      write down the answers you agree on;
     e.      get the signatures for the verdict certificate; and
     f.      notify the bailiff that you have reached a verdict.

**Instructions for Signing the Verdict Certificate:**

1.      You may answer the questions on a vote of 10 jurors unless otherwise instructed. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2.      If 10 jurors agree on every answer, those 10 jurors sign the verdict.   If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.      All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 of you agree on other answers.  But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

_____
JUDGE PRESIDING

FILED
In the District Court of
Upshur County, Texas
on this the ___ day of ___ 2014
at ___ o'clock ___ M.
Carolyn Parrott, District Clerk

# TAB 3

## VERDICT CERTIFICATE

We, the jury, have answered the above and foregoing questions as herein indicated, and herewith return same into court as our Verdict.

**CHECK ONE:**

____✓____ **Our verdict is unanimous.** All <u>Twelve (12)</u> of us have agreed to each and every answer. The presiding juror has signed the certificate for all <u>12</u> of us.

_Sharon Beasley_
Signature of Presiding Juror

_Sharon Beasley_
Printed Name of Presiding Juror

_____ **Our verdict is <u>not</u> unanimous.** <u>Ten (10)</u> of us have agreed to each and every answer and have signed the certificate below.

Jurors' Signatures                           Jurors' Printed Names

1. _____          _____

2. _____          _____

3. _____          _____

4. _____          _____

5. _____          _____

6. _____          _____

7. _____          _____

8. _____          _____

9. _____          _____

10. _____         _____

11. _____         _____

## ADDITIONAL VERDICT CERTIFICATE

I certify that the jury was unanimous in answering the following questions: Question 4, and Question 10. All 12 of us agreed to each of the answers. The presiding juror has signed the certificate for all 12 of us.

_Shaion Beasley_
Signature of Presiding Juror

_Sharon Beasley_
Printed Name of Presiding Juror